Gkeen, J.
delivered the opinion of the court.
This bill is filed under the act of 1839-40, ch. 1, sec. 4, charging the private stockholders with having fraudulently obtained the subscription of the State for one-half of the stock of *306 the road; and by a fraudulent misrepresentation, obtaining the bonds of the State for $9,000, and to benefit themselves, with so managing, as to obtain, themselves, contracts for building the entire road, at prices greatly above the real value of the work to be done.
The bill prays that the connection of the State and the defendants be dissolved, and that the $9,000 of bonds be refunded, or that an account be taken, and such deduction be made from the price to be paid by said contracts, as may comport with the real value of the labor to be performed. The answers of the stockholders deny the fraud charged, but show from their journals, receipts, bonds, and other exhibits, the following facts:
In pursuance of previous notice, the commissioners,-named in the act of incorporation, opened books for the subscription of stock in the town of Jefferson on the 24th of March, 1838, at which time eight individuals' subscribed stock to the amount of $42,000. These persons appointed committees to locate and lay off the road. On 29th of March, they elected a president and secretary; and a majority of the commissioners declared that the capital stock of the road should be six thousand dollars per mile. On the 14th of April, in pursuance of notice, the road was publicly let out to the lowest" bidder, but it was made a condition in the contract, that the bidder was to be paid in State bonds for one-half the work, and for the other half he was to take stock in the road. Those who had subscribed the stock became the contractors, at an average price of $6,000 per mile; but they announced, that bids would be received for ten days from any other person, and that any one bidding under the price at which the work had been let, should be entitled to the contract, provided he would receive an assignment of stock for one-half the work, and agree to take the bonds of the State for the other half. No one was found willing to take the work at a less price, upon the terms proposed.
On the 5th of May, the private stockholders elected directors on their part, and on the 26th June, the governor commissioned directors on the part of the State. On the 21st July the board of directors thus organized, met and resolved unanimously, that the proceedings in relation to laying off the route, and contract- *307 mg for ike construction of the road, be ratified and confirmed.
On the 28th July, the stockholders paid in'10 per cent upon the amount of their stock subscribed, and each of them having contracted to construct portions of the road, the amount so paid in, was paid the same day to such persons, and their receipts executed to the company for so much money, to be worked out on the road.
The directors then made a certificate to the governor, that the stock subscribed by the individual stockholders was well secured, and that 10 per cent, upon the amount had been paid in; whereupon, the governor as required by the 22d section of the general internal improvement law of 1837-8, subscribed on behalf of the State for one-half of the stock of said road.
On the 24th and 30th of November, the individual stockholders paid in 5 per cent, upon the amount of their stock: and having received the same amount of money 'back again the same day, they executed receipts for the sums so paid, to be worked out on the road. The president ■ and directors of the company having notified the governor of the payment of the additional 5 per cent, he caused to be executed and delivered to the company, the bonds of the State to the amount of $6000, according to the provisions of the 23d section of the internal improvement law of 1837. Afterwards, on account of work done on the road by the contractors, bonds of the State were issued to the amount of $3000, making in all $9000.
The company was offered a bid for six miles of the road at $4000 per mile, (exclusive of bridges and the expense of engineering,) to be paid in money every four months, which bid was not accepted.
From all the proof, it appears that the construction of the road would have cost in money, at prompt payments, about $4000 per mile; and if payable one-half in State bonds, (then 20 or 25 per cent, discount,) and the other half in money, about $5000 per mile; but if paid in the stock of the road for one-half, and in State bonds for the other half, the work could not have been done for a less price than that agreed to be given, $6000 per mile.
The different contractors have among themselves tin agree *308 ment, that they are to be paid in proportion to the labor and expense of construction — and each mile of the road is to be made at a price that has been fixed — the'lowest at $4618, and the highest at $7350. By a report of commissioners, appointed by the governor, to investigate the. facts concerning the questions involved in this controversy, dated the 14th February, 1840, work had been done upon this road to the amount or value of $45,000.
This bill was filed the 31'st of May, 1841.
The question first to be consided is, whether the subscription for stock on the part of the State, and the subsequent issuance of the bonds for $6000 were procured by misrepresentation on the part of the private stockholders, and a mistake of the facts upon the part of the governor. And we have no doubt they were. The stipulation in the -22d section of the internal im~ provement law of 1837-8, that two-thirds of the directors of a company should make known to the governor, that the individual stockholders were solvent and able to pay, and that they had paid in 10 percent, of their stock, was intended to guard the State against the hazard of embarking in improvident and unprofitable works ■ of improvement. It was known that the governor, who was to subscribe, could not always form a correct judgment in relation to the utility of any given work; and it was thought, the public would have a safe guaranty for the expenditure of its funds upon suitable objects only, if there were an assurance in advance, that private individuals were willing to invest their capital in them.
The deposit of 10 per cent, upon the amount of stock in the hands of the company’s treasurer, it was thought, would furnish sufficient evidence of the propriety of the expenditure, to justify the State in- giving its aid and assistance, by becoming connected with it. . . '
But it is apparent, that all this object was defeated, and these precautions were frustrated by the course pursued in this instance. For all substantial purposes, the payment was the same as though there had been no payment at all. The money having been paid and returned the same day, the thing was in substance, as though nothing had been done. The receipts for the *309 money so returned, created no obligation, which was not much better secured by the contracts for the construction of the road. The whole transaction, therefore, was delusive, and afforded no evidence by the bona fide payment of money as contemplated by the legislature, that the work was such an one as the State ought to encourage.
These facts were not communicated to the governor, as they actually occurred, but a material part of the transaction was suppressed. He was not informed, that at the very time he was about to subscribe for stock'on behalf of the State, upon the supposition that there were upwards of four thousand dollars in the treasury of the company, there was in fact, not one cent. He was not informed, that although the ceremony of making-payment had been gone through, yet the money so paid, had been handed to the persons paying it, the same day, and that substantially, the ten per cent, required by law, as a condition precedent to his subscription, had not in fact been bona fide paid. Had the governor known these facts just as they existed, he would not have felt himself authorized by the law, to subscribe for stock on behalf of the State.
The same remarks may be made in reference to the payment of the 5 per cent, in order to obtain the State bonds. The same procedure occurred in the payment and return of the money upon this occasion, as when the 10 per cent, had been paid; and the bonds were issued, in ignorance of all the facts.
But it is insisted, that by the fourth section of the charter of this company, passed in 1837-8, the stockholders had the right to pay for their stock in work upon the road; and, therefore, the receipts for so much money, to be worked out on the road, were equivalent to a payment of money; the contracts to build the road, being well secured.
It is true the fourth section of the act incorporating this company, - doe's provide, that “the stockholders in said company, shall have the right of paying for their stock in work upon said road, provided they will do it as low as any other person.” But it does not say, that the State is to rely upon their promise to pay for the stock in work, as an authority to the governor to subscribe for the State. They may pay for their stock in work, *310 after the company shall be organized, and the State’s subscription has been obtained, and the first bonds are executed and delivered. Then any stockholder who is a contractor, may work out the price of his stock, and as his work advances, he may get a receipt for so much paid in. In this way the general law, and the fourth section of the charter are consistent, and may stand together. But certainly the legislature did not intend, in creating this corporation, to abandon all the precautions of prudence provided by the general law on the subject. On the contrary, the provisions of the general law, in the 21st section, relates in terms, to all incorporations for roads, which theretofore had been, or might thereafter be enacted.
It is, therefore, clear, that before the subscription on the part of the State should have been made, ten per cent, of the stock subscribed, should have been paid in. And before any bonds should have been executed and delivered to the company, the additional sum of five per cent, should have been paid. This was not done, bona fide, as contemplated by the law, but the governor in subscribing, and delivering the bonds, acted under the mistaken impression, that the law had been complied with. These being the facts, there would be no doubt, b,ut that the contract should be rescinded, unless subsequent transactions have affected the rights of the parties. For nothing affords a clearer ground of equitable relief, than a case where a contract is obtained by misrepresentation on the one part, and mistake of the facts upon the other.
But the parties have gone on with this work from July 1838, until this bill was filed in May 1841, a period of nearly three years, and very large expenditures have been made, much of the work completed in detached distances, and if now abandoned, the whole expenditure will be lost, and all that has been done will be useless. Besides, the State was represented in this board of directors by an equal number of members with those who were appointed by the individual stockholders; and these facts were within their knowledge, and took place with their concurrence and sanction.
It is cerLainly true, that if the agents of the StaLe united with others, in committing a corrupt fraud upon their principal, the *311 transaction would not be binding. But although we think the whole facts were not communicated to the governor, and have no doubt he acted under a mistake, yet we are not of opinion, that the stockholders and directors of the company intended to defraud the State. They seem,to have supposed, that as the fourth section of their charter permitted them to pay for their stock in work, they might, for the attainment of that end, disregard a compliance with the literal requirements of the general law; or, that giving their receipts for money which had actually been paid-in, to be worked out subsequently by them, was the only way, a compliance with the general law, would at the same time, place them in a situation to get the benefit of the fourth section of their charter. Supposing these to have been their views, (although we think erroneous ones,) they stand acquitted of all intentional fraud.
The question then is, whether the State is not bound by its agents, as a natural person acting through agents is bouizd. The truth is, a government can only act through its agents; and all its officers, executive, legislative, judicial and ministerial, are merely agents. To assume, therefore, that it is not bound by the acts of its agents, is to deny its capacity to create an obligation. But this will be contended for by no one.
The transactions in reference to the payment of this money, and the notification of the fact to the governor, were the very things for which they were, appointed, and which devolved upon them as a duty. The ratification of the contracts, and the certificates in relation to the stock paid in, were acts clearly within the scope of their agency. We are, therefore, of opinion, that the State is bound, by what has been done. So that a rescission of the contract by which its subscription was obtained, cannot now be decreed.. '
2. The alternative prayer of the, bill is, for an account, and for a decree reducing the contracts for the construction of the •road, to such prices as would have been offered, had no improper restriction, as to the manner of payment, been imposed. We are of opinion, that the requirement, that any person making a bid for a contract to build the road, should receive payment in equal proportions, in State bonds, and in stock of the *312 company, was improper, at least so far as regards the part to be paid in. stock. -
The law requires, that if a stockholder wish to pay for his stock in work on the road, he must perform that work as low as any other person. The meaning is, that he must do it as low as another person, not a stockholder, will do it, if paid in money. In order, therefore, that the contracts should have been made, so as to carry out this requirement, they should have been offered indiscriminately to all, the work to be paid for in State bonds and money, in equal proportions. When competition had been thus produced, and the lowest bid ascertained, then the directors might have given the stockholders the preference of taking the contracts at such lowest bid. It is no answer to this view of the case, to say, that the credit of the bond’s had fallen greatly, and that had the stockholders paid in money one-half the price of the work, they would have been compelled to pay a sum greatly beyond the value of the State’s bonds. That was a matter known to them when they became subscribers for stock. It was a voluntary engagement on their''part, with a knowledge of the law; and if for any reason, they chose to become stockholders, they should have complied with the law, according to its plain import. Had they done so, there is very little doubt, but' that the contracts would have been reduced to $5000 per mile. In that case, they would have paid for their stock in work as low as any other person would have done it.
The manner in which the contracts were taken, therefore, would have been a good ground for setting them aside altogether, had the complainant come in time. And even now, would authorize a decree, reducing the amount to be received from the State to its share of a reasonable compensation, were it not for the ratification of these contracts by the board of directors, after the members on the part of the State had been appointed, and had taken their seats.
But believing as we do, that no fraud was intended, by this mode of letting the contracts, we think the State is bound by the ratification and .confirmation thereof by its agents.
The bonds of the State, were worth only 75 or 80 dollars in the hundred; and it seems to have been thought fair, that as *313 the State paid in bonds of less value than money, the stockholders were justified in paying for their share of the work, in stock, also of less value than money.
In this, they were mistaken. They had agreed to contribute money to the amount the State might give its bonds, dollar for dollar, and they had no right, by a resort to this mode of payment, to lessen the extent of their own obligations, because the bonds became less valuable than they had supposed they would be.
But as we believe they entertained these views, however erroneous, and as great fairness in inviting competition for bids, upon the terms they proposer!, is shown to have existed, we think there is no intentional fraud in this part of the case; being ratified by the agents of the State,-the contracts were confirmed by the complainant with a knowledge of the facts, and, therefore, no account can be ordered. The decree must, therefore, be affirmed.